POLEN, J.
The defendant, Fritz Pamphile, appeals his conviction for unauthorized possession of a driver’s license or identification card. He argues that the trial court erred in denying his motion to suppress the unauthorized identification card because the arresting officers/agents lacked a sufficient reasonable suspicion for the investigatory stop that occurred after he left a gun show in West Palm Beach. Most notably, he contends that: (1) the agents watched him for nearly two hours, during which time he did not commit a crime or provide any indication that he was about to commit a crime; (2) the agent’s suspicion that he had violated a county ordinance requiring a waiting period for the firearm he purchased was unreasonable; and (3) the trial court erroneously pointed to him violating Florida’s open carrying of weapons statute as a basis for the stop. We agree with these arguments, and each will be addressed in turn. The court erred in denying the motion to suppress. As such, we reverse the conviction.

Background

At the suppression hearing, testimony from an agent from the Bureau of Alcohol Tobacco and Firearms (ATF) and a sergeant from the Palm Beach County Sheriffs Office (PBSO) revealed the following. On the day in question, the agent was working with a task force made up of ATF agents, PBSO deputies, and West Palm Beach Police officers to monitor sales and purchases of firearms at the gun show.
The agent and his partner, who were working undercover, noticed the defendant walking around the gun show with two other males. The agents observed the men coming together and separating, which the agent testified was common at gun shows when people are attempting to engage in a “straw purchase.”[1] The agent suspected something was not right because he observed the defendant and his companions go to various booths, “talk, pick up guns, and leave.” The agent then saw the *519 defendant speaking to a gun dealer whom the agent knew was not licensed. The defendant ultimately purchased an AK-47 from the dealer. The agents were not watching the defendant the entire time, and never saw him show the dealer his concealed weapons permit for the firearm purchase. However, the agents did overhear the defendant tell the dealer that he was going to take the firearm to New York.
The agents continued to follow the defendant based on his statement that he was going to take the gun to New York and the agent’s knowledge that it can be illegal to purchase a firearm in one state and transport it to another state. During this time, they observed him carrying the firearm in his hand around the gun show.
The defendant eventually met up with his two friends and left the gun show carrying the firearm in his hand. Based on the defendant’s earlier statement that he was going to take the gun to New York and the agent’s suspicion that he may have also violated the five-day waiting period ordinance,[2] the agent called PBSO officers located outside the show to stop the defendant for suspected firearms violations. The defendant and his friends had left in a vehicle, and the officers pulled them over approximately a half mile away in a shopping center parking lot. A PBSO sergeant approached the car and asked the defendant to produce identification. The defendant provided his proper identification; however, in an attempt to locate that ID, he dropped a California identification card, which turned out to be fraudulent.
The trial court denied the motion to suppress, finding that the totality of the circumstances gave the officers reasonable suspicion that a crime had been committed or was about to be committed. In so ruling, the predecessor judge who is subject to this appeal, Judge Smith, concluded, “[the agent] surveilled him for two hours, watched all of his behavior, and ultimately did see him commit a violation of the law by carrying a gun openly out in the parking lot.” A written order denying the motion followed.
The defendant pled no contest to the unauthorized possession of a driver’s license or identification card charge. He was sentenced to ten days in jail followed by two years of probation. He appealed, and the trial court granted his motion to stay his sentence pending the appeal of the denial of his motion to suppress.
We affirmed, but the merits of the defendant’s claim regarding the motion to suppress were never reached. Pamphile v. State, 65 So.3d 107, 108 (Fla. 4th DCA 2011). Our decision was based on finding that the defendant’s attorney: (1) had not expressly reserved his right to appeal the denial of the motion suppress; and (2) failed to obtain a proper finding that the ruling on the motion to suppress was dis-positive. Id. at 108-09.
Because the trial court had issued the order staying his sentence, the defendant was permitted to file a motion to withdraw his plea on the ground that it was neither voluntary nor intelligently made. He also filed a written motion requesting that the trial court declare its ruling on his motion to suppress dispositive. A successor judge who is not subject to this appeal, Judge Oftedal, held a hearing on the motion where he found that the defendant intended to plead to the court, but also that the defendant had intended to reserve his right to appeal. Thus, the judge entered a written order finding that the prior ruling on the motion to suppress was dispositive. The court then sentenced the defendant to *520 the same sentence originally imposed. The court also ordered his sentence stayed pending the outcome of any appeal. This appeal followed, and we now have jurisdiction to review the trial court’s denial of the motion to suppress on the merits.

Analysis

“A trial court’s ruling on a motion to suppress comes to the appellate court clothed with a presumption of correctness and the court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustaining the trial court’s ruling.” Bethel v. State, 93 So.3d 410, 413 (Fla. 4th DCA 2012) (citation and quotations omitted). In doing so, “[t]he appellate court defers to the trial court’s findings regarding the facts and uses the de novo standard of review for legal conclusions.” Nshaka v. State, 82 So.3d 174, 178-79 (Fla. 4th DCA 2012). However, we are bound only by those findings of fact which are supported by competent, substantial evidence. Peraza v. State, 69 So.3d 338, 340 (Fla. 4th DCA 2011).
In order to stop and detain a person for investigation, a law enforcement officer “must have a reasonable suspicion that the person has committed, is committing, or is about to commit a crime.” Slydell v. State, 792 So.2d 667, 671 (Fla. 4th DCA 2001). See also Popple v. State, 626 So.2d 185, 186 (Fla.1993); § 901.151(2), Fla. Stat. (2008). “Whether an officer has reasonable suspicion for a stop depends on the totality of the circumstances, interpreted in consideration of the officer’s knowledge and experience.” Thornton v. State, 80 So.3d 1141, 1142-43 (Fla. 4th DCA 2012) (citation omitted).
Based on the totality of the circumstances — interpreted in consideration of the agents/officers’ knowledge and experience — which were presented by the State at the suppression hearing, we conclude that the trial court erred in finding that the agents had sufficient reasonable suspicion for the stop for the following reasons.
First, the ATF agent’s initial reason for suspicion was based on his observation that the defendant and his companions were coming together and separating, which the agent testified was common at gun shows when people are attempting to engage in a “straw purchase.” The agent specifically pointed to the men approaching various booths, talking to the respective dealers, picking up guns and then walking away. This behavior is not indicative of criminal activity because, if it were, then anytime a group of individuals attended a gun show and separated for any period of time, law enforcement would have the legal right to stop and detain those individuals if a purchase was made. At the suppression hearing, the agent admitted that such behavior could be consistent with “innocent behavior” as well. Moreover, there was no testimony that the agents ever saw the defendant exchange money with any of his companions, which could reasonably indicate that a straw purchase was occurring. Thus, there was no competent, substantial evidence to support a finding that the agent’s observations revealed any reasonable suspicion of past, present, or future criminal activity.
Likewise, the finding that the ATF agent had reasonable suspicion to believe a crime was about to be committed based on overhearing the defendant’s statement that he was going to take the gun to New York was also not supported by competent, substantial evidence. There was no evidence presented at the hearing that the defendant was going to sell the gun in New York or transport it in an illegal manner, thereby engaging in illegal activity. To the contrary, the ATF agent testified that although it can be illegal to transport firearms across state lines, the gun could be legally transported if the proper procedures were followed.
*521 Second, neither competent, substantial evidence nor law supported the court’s finding that the ATF agent had a reasonable suspicion to believe that a county ordinance had been violated. The agent based this suspicion upon the fact that he never saw the defendant show the unlicensed dealer his concealed weapons permit. However, the agent admitted that he and the other agents were not watching the defendant the entire time. Thus, the agents’ failure to observe the defendant show his concealed weapons permit to the dealer, when such permit allowed him to legally obtain the weapon without waiting under both the county ordinance and Florida law, was not a reasonable basis to believe he had committed a crime. There was no evidence presented showing that the defendant knew that the dealer from whom he purchased the gun was either unlicensed or engaging in any other illegal activity. If anything, the evidence at the hearing suggested suspicious activity on the part of the seller, but it was not improper for the defendant to purchase the firearm and then fail to announce that he did, in fact, have the proper permit.
Finally, the trial court erroneously pointed to the defendant violating section 790.58(1), Florida Statutes (2008) — which prohibits openly carrying a weapon — as a valid basis for the stop. The agent did not even mention this as being a basis for his or the other agents’ suspicions that a crime either had been or was about to be committed. Instead, the agent’s testimony that the defendant left the gun show while carrying a firearm into the parking lot on the way to his car was elicited in response to suggestive questions by the prosecutor after the agent had already articulated his suspicions. Moreover, section 790.25(8), Florida Statutes (2008), provides for lawful uses of a firearm which are exceptions to section 790.053, Florida Statutes’ prohibition on openly carrying one. Specifically, section 790.25(3)(m) provides for the following lawful purpose: “[a] person while carrying a pistol unloaded and in a secure wrapper, concealed or otherwise, from the place of purchase to his or her home or place of business....” At the hearing, there was no evidence presented suggesting that the gun the defendant had just purchased was either loaded or that it was improperly wrapped. Rather, the evidence on this issue was limited to the agent’s vague answer to the prosecutor’s suggestive question.
For the foregoing reasons, we hold that the trial court erred when it determined that the agents/officers had sufficient reasonable suspicion to stop the defendant. Accordingly, we reverse. Because the issue was dispositive, we remand for the trial court to vacate the defendant’s conviction and sentence.

Reversed and remanded for proceedings consistent with this opinion.

GROSS, J., and SHAHOOD, GEORGE A., Senior Judge, concur.

. A straw purchase, as it relates here, occurs when an individual purchases a firearm for another individual who either cannot purchase one legally or chooses not to do so.

. Palm Beach County requires a five-day waiting period for delivery of a firearm after a purchase unless a concealed weapons permit is produced. Palm Beach County Code of Ordinances, Art. II, Div. 1, Sec. 28-23.